UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>MARCUS ENRIQUE ESPINOSA , and<br>SAMMY CISNEROS<br><br>                    Defendant. | 5:15-CR-50016-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant Sammy Cisneros' Motion to Suppress Evidence (Doc. 85).  Co-defendant, Marcus Enrique Espinosa, filed a motion to join the motion to suppress and a motion to suppress.  (Doc. 97).  A hearing was held on Monday, May 16, 2016.  Mr. Cisneros was personally present and represented by his attorney of record, Angela Colbath.  Mr. Espinosa was personally present and represented by his attorney of record, Michael Wheeler. The United States was represented by Eric Kelderman.  Three witnesses testified at the hearing.  Three exhibits were received into evidence.  At the conclusion of the hearing, the parties requested they be allowed to file supplemental briefing.

Mr. Cisneros filed a supplemental brief on May 23, 2016.  (Doc 103).  Mr. Espinosa also filed a supplemental brief on May 23, 2016.  (Doc. 104).  The United States filed a supplemental brief on July 6, 2016.  (Doc. 109).  The

evidentiary transcript was filed on July 11, 2016. (Doc. 112). Mr. Espinosa

filed a supplemental reply brief on July 14, 2016. (Doc. 113).

## RECOMENDATION

Based on careful consideration of all the evidence, and counsel's written

and oral arguments, the Court respectfully recommends the motion be denied.

## JURISDICTION

Defendants are both[1] charged in an Indictment with Conspiracy to

Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a) and

841(b)(1)(B). Defendant Espinosa is also charged with Possession of Firearms

by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) and (2) and

924(e)(1). Defendant Cisneros is also charged with Possession of an

Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. The

pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9,

2015.

## FACTUAL BACKGROUND

On December 12, 2014 at approximately 6:38 a.m., Sergeant James

Twiss, ("Sgt. Twiss") of the Oglala Sioux Tribe Public Safety, responded to a

motorist assist call to a location near Porcupine, South Dakota. (Doc. 112 at

pp. 5-6; Exhibit B). Sgt. Twiss arrived at the vehicle 6:46 a.m. and

encountered a female driver, a female passenger, a male passenger, an infant,

and a dog. (Doc. 112 at pp. 6, 10, and 30). The vehicle was partially blocking

---

[1] The third co-defendant, Brenda Lee Otwell, did not join the motion to suppress.

the roadway; the windows were fogged up; and the emergency flashers were on. (Doc. 112 at p. 6). The driver, later determined to be Brenda Lee Otwell, told Sgt. Twiss that the vehicle had run out of gas and requested his assistance to get gas. (Doc. 112 at p. 7). The male volunteered to accompany Sgt. Twiss to the gas station. (Id.) It has now been determined that this male's name is Marcus Enrique Espinosa.

Sgt. Twiss and Mr. Espinosa arrived at the Common Cents gas station at 6:56 a.m. (Exhibit B). Sgt. Twiss saw another male, now known to be Sammy Cisneros, carrying a gas can. (Doc. 112 at p.8). Mr. Espinosa stated that Mr. Cisneros was a part of the stranded party and went to speak with Mr. Cisneros. Id. Mr. Espinosa stated he would ride back to the stranded car with Mr. Cisneros, who apparently had a ride back to the car. (Id. at pp. 8-9; Exhibit B at 7:01:51 a.m. dispatch description "male met up with another male who took off walking with a gas can they adv they a ride back" [sic]). Sgt. Twiss thought it was unusual that no one in the stranded party mentioned that Mr. Cisneros had left the group to get gas. Before leaving the two men, Sgt. Twiss requested identification from Mr. Espinosa and was told he didn't have any. (Doc. 112 at p. 9). Mr. Espinosa identified himself as Fabian Espinosa and provided his date of birth. (Doc. 112 at pp. 9-10). At 7:02 a.m., dispatch cleared the call. Sgt. Twiss did not advise dispatch that he was returning to the stranded vehicle.

Sgt. Twiss drove back to the stranded vehicle by himself. He returned because the stranded vehicle was a road hazard and at that time of the

morning, school buses were present.  (Doc. 112 at p. 10).  When he arrived at the stranded vehicle, he advised dispatch of his location, parked behind the vehicle with his emergency lights engaged, and engaged his lapel camera before he approached the car.   (Doc. 112 at p. 10-11; Exhibit B).  He arrived back on the scene at 7:07 a.m.  (Exhibit B).  When Sgt. Twiss arrived, another vehicle was present and trying to assist the stranded vehicle; the hood of the stranded car was up.[2]  (Doc. 112 at p. 18).

Sgt. Twiss requested a license from the female driver, Brenda Otwell. (Doc. 112 at p. 13).  Ms. Otwell's drivers licensed came back as a suspended driver's license.  Id.  He asked the name of the male he drove to the gas station and both women told Sgt. Twiss the male's first name was "Marcus," but didn't know his last name.  (Doc. 112 at p. 14).  The women confirmed the male Sgt. Twiss encountered at Common Cents was with their party.  (Doc. 112 at p. 15). They said his name was "Sam," but neither knew his last name.  (Doc. 112 at p. 15).  The female in the back of the car presented an identification card showing her to be Brianna Coal.  Id.  Ms. Coal later said she knew Sam's last name, but didn't provide it to Sgt. Twiss.  Id.  Sgt. Twiss discovered the party was driving to Denver, Colorado.  Id.  The vehicle had South Dakota license plates.  (Doc. 112 at p. 29).  At 7:12 a.m., Sgt Twiss called for a K-9 officer to respond to the scene.  (Doc. 112 at p. 84).  Sgt Twiss ran driver's license check and warrant checks on the two females at 7:13 a.m.  (Doc. 112 at p. 16;

---

[2] It is unclear as to why the hood was up.

Exhibit B).  Sgt. Twiss was at the vehicle for approximately 9 minutes before Mr. Cisneros and Mr. Espinosa arrived at 7:16 a.m.  (Exhibit B).

When Mr. Cisneros and Mr. Espinosa arrived, Sgt. Twiss again confirmed that Mr. Espinosa stated his name was "Fabian" and he did not have identification on him.  (Doc. 112 at pp. 18-19).  Mr. Espinosa stated that he was with Sam Cisneros, his brother-in-law.  (Doc. 112 at p. 20).  Mr. Espinosa said that Mr. Cisneros left to find gas during the night, walked south for 15-20 miles and couldn't find gas.  Id.  Mr. Espinosa stated that Mr. Cisneros returned to the stranded vehicle and then caught a ride with a bus driver.  Id.  Sgt. Twiss asked Mr. Espinosa for his identification; Mr. Espinosa didn't have any identification.  (Doc. 112 at pp. 20-21).  Sgt. Twiss ran a driver's license check and a warrant check on Mr. Espinosa at 7:24 a.m.  (Doc. 112 at p. 50; Exhibit B).

Sgt. Twiss then called Mr. Cisneros over and obtained his name, date of birth and address and provided the same to dispatch at 7:29 a.m.  (Doc. 112 at pp. 21, 51).  Mr. Cisneros was from Denver, Colorado.  Id.  While Sgt. Twiss was obtaining information on the males, the hood was closed, but gas was still being put into the vehicle.  (Doc. 112 at p. 22).

At about this point in the encounter, Sgt. Twiss told the vehicle's occupants to "hold on" while he submitted identification information on Mr. Espinosa and Mr. Cisneros to dispatch.  (Doc. 112 at p. 23).  Sgt. Twiss learned that "Fabian" was Marcus Espinosa who did not have a driver's license.  (Doc. 112 at p. 24).  Sgt. Twiss inquired as to who owned the vehicle.  Ms. Otwell

said a friend of hers owned the vehicle, but she had a hard time providing the name of her friend. (Doc. 112 at p. 28). Also at this time, a K9 unit arrived and sniffed the vehicle. The dog detected drugs at approximately 7:33 a.m. (Exhibit B; Doc. 112 at pp 88-89). Shortly thereafter, dispatch advised Sgt. Twiss that Mr. Cisneros had an active arrest warrant. (Doc. 112 at p. 27). Law enforcement placed Mr. Espinosa and Mr. Cisneros in separate patrol cars. (Doc. 112 at pp. 27-28). The officers searched the car and found a pistol, a shot gun, methamphetamine and paraphernalia. Mr. Cisneros was placed in handcuffs on account of the warrant and was searched. (Doc. 112 at pp. 27, 33-34). The two males and two females were transported to the Porcupine Substation. (Doc. 112 at p. 97). While waiting for Bureau of Indian Affairs ("BIA") agents to arrive, one of the females revealed that Mr. Cisneros asked her to remove an item from his shoe. (Doc. 112 at pp. 98, 113-114). Mr. Cisneros' shoe was searched and four bags of methamphetamine were found in his shoe.

Mr. Cisneros and Mr. Espinosa moved to suppress all evidence obtained as a result of the search from the vehicle and from Mr. Cisneros' person. (Doc. 112 at p. 100-101)(The parties acknowledged the scope of this motion is limited to the detention on the side of the road and the resulting search of the car).

## **DISCUSSION**

### I.    **Sgt. Twiss Engaged the Defendants in a Consensual Encounter**

The Defendants argue that they were unreasonably detained. (Doc. 86 at p. 2-3; Doc. 97). The parties disagree over whether the stop was a traffic stop or a consensual encounter. (Doc. 86 at p. 2 (Defendant Cisneros discussing an

6

investigatory stop of a vehicle); Doc. 89 at p. 6 (Government arguing the stop was a consensual encounter and not a traffic stop)).  The court finds the interaction was a consensual encounter.

"A seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required."  United States v. Salgado, 761 F.3d 861, 865 (8th Cir. 2014) (citing Florida v. Bostick, 501 U.S. 429, 434 (1991)).  This is so, "even if the officer has no reason to suspect the individual is involved in criminal activity."  United States v. White, 81 F.3d 775, 779 (8th Cir. 1996) (citing Bostick, 501 U.S. at 434-35).  The government bears the burden to show the encounter was consensual.  United States v. Aquino, 674 F.3d 918, 923 (8th Cir. 2012) (other citations omitted).

However, a consensual encounter can become a seizure "implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave."  United States v. Villa-Gonzalez, 623 F.3d 526, 531-32 (8th Cir. 2010) (internal quotations omitted) (other citations omitted).  Seven non-exclusive factors to consider are: "officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary,

the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." Aquino, 674 F.3d at 923.

In certain circumstances, such as those presented by stranded motorists, police may reasonably "engage in a community-caretaking function with respect to motor vehicles and traffic." Salgado, 761 F.3d at 865 (citing United States v. Smith, 162 F.3d 1226, 1226 (8th Cir. 1998) (per curiam)).

In Salgado, a police officer found a broken down vehicle on the side of the road at about 1:40 a.m. 761 F.3d at 863. The defendant and another man walked from the front of the car and told the officer several times they did not need help. Id. The officer found this behavior unusual based on his past experience assisting motorists. Id. When the officer shined his flashlight on the backseat of the vehicle, he saw a third person and a jacket with a marijuana leaf embroidered on it. Id. The officer asked which man had been driving the vehicle. Id. The defendant responded that he had. Id. The officer asked for a driver's license, but the defendant did not have one. Id. The officer took the defendant to the squad car to process him for driving without a license. Id. He also provided the dispatcher with the defendant's name and date of birth, but no records were found using the information given. Id. The officer also questioned the defendant about his itinerary. Id. The defendant was also unable to identify his travel companions. Id.

The court found that the officer was exercising his community-caretaking function when he stopped to assist the motorists in the stranded vehicle. Id. at 865. His actions did not trigger the Fourth Amendment just because he

8

remained on the scene when the defendant and his company refused the officer's help.  Id.  "A reasonable person in [the defendant's] position would have understood that a state trooper had legitimate reasons to monitor the situation without seizing the motorist."  Id.

Similarly, in the present case, Sgt. Twiss was dispatched to exercise his community-care taking function.  He learned there was a disabled vehicle and he stopped to help the vehicle's occupants.  Unlike the occupants in Salgado, Mr. Cisneros' and Mr. Espinosa's travel companions responded positively to Sgt. Twiss' assistance.  Despite the fact that the situation was made better by the fact that Mr. Espinosa and Mr. Cisneros were reunited and Mr. Cisneros had a gas can, the car was still disabled partially in the road, in the middle of winter and with an infant in the vehicle.  At this time of the morning, Sgt. Twiss had a legitimate concern with increased morning traffic including school busses traveling on the roadway which was partially obstructed by the disabled car.  Sgt. Twiss had legitimate reasons to monitor the situation.

Mr. Espinosa and Mr. Cisneros argue that Sgt. Twiss's testimony is disingenuous because he take efforts to have the vehicle pushed off the roadway into a nearby approach, nor did he invite the women and baby to wait in his heated patrol car.  The court rejects this argument.  The court finds that Sgt. Twiss was a credible witness.  Proposing alternative courses of action regarding what Sgt. Twiss could have done does not undermine his credibility.  Defendants also point out discrepancies between his live testimony and the video recordings found at Exhibits 1 and 2.  While minor differences exit, the

court does not find these differences render Sgt. Twiss's testimony dishonest or not credible.

The court finds that Sgt. Twiss's actions in returning to the scene, parking behind the disabled vehicle, and monitoring the situation was reasonable under the circumstances.

## II.    Extension of the Encounter

During the hearing, Sgt. Twiss testified that at one point, he instructed the occupants of the car to "hold on" while he contacted dispatch regarding their identities and potential active warrants.  The court finds that once Sgt. Twiss took the identification cards and instructed the occupants to "hold on," they no longer felt free to leave and were subject to a seizure implicating the Fourth Amendment.

When transitioning between a consensual encounter and a seizure, officers must have "a reasonable articulable suspicion of criminal activity" to lawfully seize a defendant.  United States v. Griffith, 533 F.3d 979, 983-84 (8th Cir. 2008) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

In Griffith, the officers saw Griffith and a woman parked in the parking lot of a housing development.  533 F.3d at 981.  The area had a history of drug related activity and officers had orders to identify people on the property and exclude anyone on the housing authority's "trespass list."  Id.  Officers approached and questioned the vehicle's occupants.  Id.  The occupants did not appear to be entering or exiting the vehicle and they observed the officers closely when the officers passed by.  (Id.)  The woman was agitated and gave

10

conflicting reasons for her presence on the property and Griffith appeared to be trying to hide something under the seat. Id. at 984.

The court found that the initial interaction was consensual because the officers did not inhibit the vehicle's occupants from leaving and they did not draw their weapons or otherwise intimidate the occupants or demand they comply with the officer's investigation. Id. at p. 384. Also, the interaction transitioned from a consensual encounter to a lawful investigatory Terry stop because the officer's had reasonable suspicion based on the occupants' behavior to suspect that criminal activity was afoot.

In the present case, Sgt. Twiss indicated that he told the occupants of the vehicle to "hold on" and gave their identities to dispatch after he was suspicious of criminal activity. The occupants were stranded on the side of the road in the middle of winter with an infant in the car. No one told Sgt. Twiss that one of their companions had previously wandered off on foot in search of gas on a cold, December morning in South Dakota. Mr. Espinosa gave Sgt. Twiss one name (misrepresenting himself to be "Fabian") and the occupants in the car identified him as "Marcus." Mr. Espinosa claimed to not have any identification or wallet. Moreover, the occupants were unfamiliar with either "Marcus" or "Sam's" last names. As Sgt. Twiss testified, it is unusual that they didn't know each other's last names, as people who travel together tend to know each other's last names. It was even more suspicious to Sgt. Twiss that one would bring a baby on a trip without knowing your travel companion's last names. (Doc. 112 at p. 49). The vehicle occupants, who were traveling to

Denver, could not readily identify the owner of the vehicle with South Dakota license plates.  These circumstances gave Sgt. Twiss reasonable suspicion that criminal activity was afoot.  Sgt. Twiss's reasonable suspicion permitted him to inquire as to the identity of the passengers and to run driver's license checks and warrant checks on them, and investigate who owned the vehicle.

Mr. Espinosa and Mr. Cisneros argue that once Sgt. Twiss observed gas being placed in the vehicle, the mission of the interaction was complete and therefore the holding of Rodriguez v. United States, 135 S.Ct. 1609 (2015) prevented Sgt. Twiss from any further inquiry.  The events at issue took place on December 12, 2014.  This was prior to the United States Supreme Court decision of Rodriguez v. United States, 135 S.Ct. 1609 (2015).  Consequently, the holding of the decision that, without reasonable suspicion, the extension of a stop to conduct a dog sniff violates the Fourth Amendment, does not apply. See United States v. Englehart, 811 F.3d 1034, 1040, n.1 (8th Cir. 2016) (citing Davis v. United States, 564 U.S. 229 (2011) ("we apply the law of the circuit as it existed at the time of the stop")).  At the time these events took place, the Eighth Circuit "permitted a *de minimis* extension of a stop to employ a dog." Englehart, 811 F.3d at 1040, n.1 (citing United States v. Rodriguez, 741 F.3d 905, 907 (8th Cir. 2014) overruled by Rodriguez, 135 S.Ct. at 1614.

Before the Eighth Circuit's ruling was overturned, "a dog sniff conducted during a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner does not infringe upon a constitutionally protected interest in privacy."  Rodriguez, 741 F.3d at 907 (citing United States v. Martin, 411

12

F.3d 998, 1002 (8th Cir. 2005) (internal quotations omitted)).  When an officer completes the purpose of a routine traffic stop, "the Fourth Amendment applies to limit any subsequent detention or search."  Rodriguez, 741 F.3d at 907 (other citations omitted).  "Accordingly, a dog sniff may be the product of an unconstitutional seizure if the traffic stop is unreasonably prolonged before the dog is employed."  Id. (citing Martin, 411 F.3d at 1002).  However, "[a] brief delay to employ a dog does not unreasonably prolong the stop . . . and we have repeatedly upheld dog sniffs that were conducted minutes after the traffic stop concluded."  Rodriguez, 741 F.3d at 907 (seven to eight minute delay was reasonable) (citing to examples where two to "well under ten minute[]" delays were upheld).

Returning to Salgado as an example, the officer requested a drug dog but, because there were none available nearby, the dog took approximately one hour to arrive.  761 F.3d at 863.  Between attempts to locate a drug dog, the officer continued attempting to identify the defendant and requested consent to search the vehicle several times.  Id.  The defendant never consented to a search of the vehicle.  Id.  When the drug dog arrived, it alerted to the presence of narcotics.  Id.  The court found the officer was justified in requesting the dog sniff and continuing to detain the vehicle's occupants for an hour.  Id. at 866.  The officer had reasonable suspicion to detain the passengers because they immediately and adamantly expressed his presence was unwelcome, the officer was unable to locate the defendant in the state databases, and he was unable to identify his fellow travelers.  Id. at 865-66.  Plus, the one hour delay was not

13

due to "any lack of diligence or unnecessary delay by law enforcement" but was due to the distance between the location of the dog and the location of the stop. Id. at 866.

Here, the facts before this court present a much stronger case than even those in Salgado. As stated above, Sgt. Twiss was operating within his community caretaking function when he returned to the vehicle. He arrived at 7:07 a.m. Given the undisclosed identity of Mr. Cisneros who previously left to get gas, as well as the fact that he had conflicting information about the identity of Mr. Espinosa, it was reasonable to expand the scope of his community caretaking function to investigate further, given his reasonable suspicion. The K-9 unit was requested at 7:12 a.m. The driver's license and warrant check on the two females was conducted at 7:13 a.m. The males arrived on scene at 7:16 a.m. Sgt. Twiss ran Mr. Espinosa's and Mr. Cisneros' information at 7:24 a.m. and 7:29 a.m., respectively. While this information was being run by dispatch, the drug dog arrived on scene and alerted at 7:33 a.m. It is unclear when the vehicle was refueled,[3] but at a minimum, the car was immobile at 7:16 a.m., when the males returned and began putting gas into the vehicle. All the while, Sgt. Twiss was still trying to determine the identity of the occupants, whether any of them had an active warrant or valid driver's license, and who owned the vehicle. Therefore, less than 17 minutes had elapsed between when the parties were reunited and when the K-9 unit alerted to the presence of drugs. This delay, if any, is a *de minimus* extension

---

[3] While Sgt. Twiss was enroute to or from Common Cents, a passerby stopped and gave the stranded vehicle a little bit of gas.

of a stop to employ a drug dog and is permissible under the Fourth
Amendment.  United States v. $404,905.00 in U.S. Currency, 182 F.3d 643,
649 (8th Cir. 1999).

### III.     Search of the Vehicle

"It is well settled that a warrantless search of an automobile is not
unreasonable if law enforcement officers have probable cause to believe that
the vehicle contains evidence of criminal activity."  United States v. Daniel, 809
F.3d 447 (8th Cir. 2016) (citing United States v. Ross, 456 U.S. 798, 823-24
(1982)).  "Probable cause exists when the facts available to an officer would
warrant a person of reasonable caution to believe that contraband or other
evidence of a crime is present."  Daniel, 809 F.3d at 448-449 (other citations
omitted).  "If probable cause justifies the search of a lawfully stopped vehicle, it
justifies the search of every part of the vehicle and its contents that may
conceal the object of the search."  United States v. Englehart, 811 F.3d 1034,
1042 (8th Cir. 2016) (other citations omitted).

When law enforcement relies on a drug dog's alert to establish probable
cause, the "appropriate inquiry is whether all of the facts surrounding a dog's
alert, viewed through the lens of common sense, would make a reasonably
prudent person think that a search would reveal contraband or evidence of a
crime.  A sniff is up to snuff when it meets that test."  United States v.
Holleman, 743 F.3d 1152, 1157 (8th Cir. 2014) (citing Florida v. Harris, 133
S.Ct. 1050 (2013)).  "[A] dog's satisfactory performance in a certification or
training program can itself provide sufficient reason to trust his alert."  United

15

States v. Trejo, No. 3:14-CR-30138-RAL, 2015 WL 4392850, *9 (D.S.D. July 15, 2015) (citing Harris, 133 S.Ct. at 1057). Also, "a defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witness." Harris, 133 S.Ct. at 1057. "In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other." Id.

Here, the drug dog, Czar, alerted to the presence of narcotics in the vehicle. The drug dog's handler, Nicholas Campbell, testified to Czar's certification and methods. (Doc. 112 at pp. 85, 88-89). The drug dog's reliability was not challenged by either Mr. Cisneros or Mr. Espinosa. The drug dog's alert gave law enforcement probable cause to search the vehicle.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, this court respectfully recommends that Mr. Cisneros' motion to suppress (Doc. 85) be denied. Additionally, this court respectfully requests that Mr. Espinosa's motion to join and motion to suppress (Doc. 97) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the

16

District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

    DATED this 23rd day of May, 2017.

                  BY THE COURT:

                  DANETA WOLLMANN
                  United States Magistrate Judge